IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| MC OIL and GAS, LLC, a Nevada limited liability company,<br><br>                   Plaintiff,<br>v.<br><br>ULTRA RESOURCES, INC., a Wyoming corporation, UPL THREE RIVERS HOLDINGS, LLC, a Delaware limited liability company, and AXIA ENERGY, LLC, a Delaware limited liability company,<br><br>                   Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT REGARDING THE FIRST RIGHT OF OFFER**<br><br>Case No. 1:15-cv-0038-DN<br><br>District Judge David Nuffer |

Defendants Ultra Resources, Inc. ("Ultra"), UPL Three Rivers Holdings, LLC ("UPL"), and Axia Energy, LLC ("Axia") (collectively "Defendants") moved[1] for partial summary judgment ("Motion") on part of the third cause of action brought by Plaintiff MC Oil and Gas, LLC ("MC Oil").[2] Specifically, the Motion seeks judgment in Defendants' favor to the extent that MC Oil alleges breach of the "first Right of Offer." The parties' memoranda and supporting documentation have been carefully reviewed. For the reasons set forth below, Defendants' Motion is GRANTED.

## BACKGROUND

MC Oil buys and re-sells wax crude oil from oil producers in the Uintah Basin in Utah. Axia began producing wax crude oil in the Uintah Basin in late 2011. On April 24, 2013, MC Oil and Axia entered into an agreement (the "Purchase Agreement") covering the sale and delivery by Axia, and the purchase and receipt by MC Oil, of crude oil under the terms and conditions specified in the Purchase

---

[1] Defendants' Motion for Partial Summary Judgment Regarding First Right of Officer ("Motion"), docket no. 205, filed October 16, 2015.

[2] Second Amended Complaint and Demand for Trial by Jury at 26, docket no. 76, filed June 4, 2015.

Agreement.[3] On or about October 1, 2013, pursuant to an Assignment, Bill of Sale, and Conveyance (the "Axia to UPL Assignment"), Axia sold certain of its oil and gas properties in the Uinta Basin to UPL.[4]

On January 13, 2015, Ultra communicated to MC Oil that, "[i]n light of the dramatic recent drop in oil prices, effective March 1, 2015, we do not plan to deliver further barrels for MC Oil under the April 24, 2013 agreement between MC Oil and Axia Energy." Ultra discontinued delivering and selling crude oil to Plaintiff on March 1, 2015.

MC Oil commenced this lawsuit on February 24, 2015,[5] asserting, among other things, breach of the Purchase Agreement. MC Oil's breach allegation is based upon Paragraph 2 of the Purchase Agreement. That paragraph provides in relevant part:

> Quantity and Quality: MC shall guarantee a base minimum of 1,000 barrels per day. Axia and MC agree to meet from time to time and discuss potential volume increases under this Agreement. Allowing Axia the first Right of Refusal on additional volumes that MC procures at the local Salt Lake City refineries. Likewise Axia agrees to allow MC the first Right of Offer on additional volumes that Axia produces in the Uintah Basin. If such increases are agreed upon, this Agreement will be amended to reflect the volume change and any new pricing negotiated.

MC Oil alleges that the Purchase Agreement was breached in two respects. First, Defendants "breached the terms of the [Purchase] Agreement by failing and/or refusing to sell and deliver to MC Oil a base minimum of 1,000 barrels of wax crude oil per day under the terms of the [Purchase] Agreement."[6] Second, Defendants "breached the terms of the [Purchase] Agreement by failing and/or refusing to acknowledge, extend, and honor the ROFO [Right of First Offer] in favor of MC Oil for the

---

[3] Purchase Agreement dated April 24, 2013, docket no. 18-1, filed under seal on March 3, 2015.

[4] *See* Letter-in-Lieu and accompanying documents, docket no. 8-1, filed under seal on February 25, 2015.

[5] Complaint and Demand for Trial by Jury, docket no. 2, filed February 24, 2015.

[6] Second Amended Complaint at 26.

2

right to purchase and receive additional volumes of wax crude oil produced by . . . [Defendants] in the Uintah Basin above the base minimum of 1,000 barrels of crude oil per day."[7]

The present Motion is directed only against MC's second breach claim. Defendants argue that summary judgment is appropriate on MC Oil's claim for breach of the "first Right of Offer" ("FROO") because the FROO is an unenforceable agreement to negotiate.

## STANDARD FOR SUMMARY JUDGMENT

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[8] When analyzing a motion for summary judgment, the court must "view the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment."[9] However, "the nonmoving party must present more than a scintilla of evidence in favor of his position."[10] A dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[11]

## UNDISPUTED MATERIAL FACTS

The parties have each offered a single material fact. The two facts are undisputed.

1.  The Purchase Agreement contains the following provision regarding the "first Right of Refusal" and "first Right of Offer":

> Axia and MC agree to meet from time to time and discuss potential volume increases under this Agreement. Allowing Axia the first Right of Refusal on additional volumes that MC procures at the local Salt Lake City refineries. Likewise Axia agrees to allow MC the first Right of Offer on additional volumes that Axia produces in the Uintah

---

[7] *Id.* at 26–27.

[8] Fed. R. Civ. P. 56(a).

[9] *Mathews v. Denver Newspaper Agency LLP,* 649 F.3d 1199, 1204 (10th Cir. 2011) (citation and internal quotations omitted).

[10] *Ford v. Pryor,* 552 F.3d 1174, 1178 (10th Cir. 2008) (citations omitted).

[11] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Kerber v. Qwest Group Life Ins. Plan*, 647 F.3d 950, 959 (10th Cir. 2011).

Basin. If such increases are agreed upon, this Agreement shall be amended to reflect the volume change and any new pricing negotiated.[12]

2. After MC Oil and Axia entered into the Agreement, Axia and its successor-in-interest, Ultra, produced volumes in excess of 1,000 BOPD from their properties in the Uintah Basin and sold those volumes to third parties without first offering to sell them to MC Oil.[13]

MC Oil, in a footnote, states that it has "filed a motion for partial summary judgment regarding the FROO (Dkt. 198). Many of the facts and arguments presented by MC Oil in its motion are pertinent to refute Defendants' present motion. MC Oil will not repeat all its facts and arguments here, but does refer the court thereto."[14] For the reasons discussed, MC Oil's additional facts do not affect the legal analysis below.

## DISCUSSION

Defendants contend that "[b]ecause the FROO explicitly leaves pricing and other essential terms to future negotiation, the FROO is unenforceable as a matter of law."[15] Defendants point out that the FROO "states that the price for 'additional volumes that Axia produces in the Uintah Basin' and other essential terms would be 'negotiated' and reflected in an amended Purchase Agreement 'if such increases are agreed upon.'"[16] Defendants argue that the "[u]se of the term 'if' signifies the conditional nature of the future transaction, and the term 'negotiated' likewise signifies that the language is only aspirational—i.e., an unenforceable agreement to agree."[17] Defendants state that their interpretation is further supported by "the second sentence of Paragraph 2, which comes before and is consistent with the

---

[12] Motion at iii; Plaintiff's Memorandum in Opposition to Defendants' Motion for Partial Summary Judgment Regarding First Right of Offer at 5 ("Opposition"), docket no. 245, filed October 23, 2015 (undisputed).

[13] Opposition at 5 (statement of additional material facts); Reply in Support of Defendants' Motion for Partial Summary Judgment Regarding First Right of Offer ("Reply"), docket no. 277, filed under seal on October 27, 2015 (Defendants do not address this fact in their Reply).

[14] Opposition at 2, n. 1.

[15] Motion at 1.

[16] *Id.*

[17] *Id.* at 6.

agreement-to-agree language."[18] That second sentence reads: "Axia and MC agree to meet from time to time and discuss potential volume increases under this Agreement."[19] According to Defendants, Paragraph 2 can only be interpreted to mean that "the parties have agreed to meet from time-to-time and negotiate future volume increases at pricing to be determined by the parties through the negotiation: A classic agreement to meet and try to agree in the future."[20]

MC Oil rejects Defendants' argument, contending that it is "based on the incorrect legal assertion that a contract that contains a preemptive right is automatically invalid because it is not sufficiently definite."[21] According to MC Oil, "'[a] right of first offer gives the grantee of the right the right to buy property before it is offered for sale to third parties.'"[22] Moreover, the right of first offer requires "'the seller, upon deciding to market its property, . . . [to] first make an offer to the grantee of the right of first offer. If the grantee does not accept that offer, the seller is then free to sell to anyone else on the terms rejected by the grantee or on terms which are better—but not worse—for the seller; in other words, no other buyer can get a better deal than that which was presented to the grantee.'"[23] Based on the above cited legal principles, MC Oil contends that the FROO provision provides MC Oil

> the right to have Defendants offer terms on additional volumes of oil to MC Oil before they attempted to sell volumes to any third parties. And because of the nature of rights of first offer, as well as the implied covenant of good faith and fair dealing inherent in every contract, Defendants were required to offer the additional volumes to MC Oil at the same price and on the same terms and conditions at which the volumes were sold to third parties.[24]

---

[18] *Id.*

[19] Purchase Agreement ¶ 2.

[20] Motion at 6.

[21] Opposition at 2.

[22] *Id.* at 3 (quoting *Kelly v. Ammex Tax & Duty Free Shops W., Inc.*, 256 P.3d 1255, 1256 (Wash. Ct. App. 2011)).

[23] *Id.* (quoting *Bill Signs Trucking, LLC v. Signs Family Limited P'ship*, 69 Cal. Rptr. 3d 589, 595 (Cal. Ct. App. 4th District, 2007)).

[24] *Id.* at 7.

MC Oil further argues that "[s]ince Defendants did sell their additional volumes of oil to third parties, there is a sufficiently definite standard by which 'the court could, without fabricating a contract, ascertain the price,' namely the exact price for which it was sold to those third parties."[25] MC Oil provides two additional reasons why "Defendants' argument that the FROO is unenforceable is problematic . . . ."[26]

> First, because there is a way to interpret and apply the FROO so that it has effect, concluding that it is unenforceable and invalid would violate the mandate that contracts should be applied "with a view toward giving effect to all [provisions] and ignoring none."[27] And second, Defendants' analysis of preemptive rights would effectively prohibit their use in any industry where the price of assets contracted for is unpredictable to any commercially significant degree—i.e., where the parties are unable to predict with any certainty what the future price of the asset should be—such as real estate or oil and gas.[28]

MC Oil concludes that "[b]ecause rights of first offer are frequently held to be enforceable even when they do not contain an explicit purchase price, and because the FROO provision contains a sufficiently definite method by which the purchase price can be determined, the FROO is not merely an agreement to negotiate and it is, therefore, enforceable."[29]

A preemptive purchase right can take the form of a right of first refusal or a right of first offer.[30] These two rights have different purposes and criteria. The conditions of, and the duties imposed by, a right of first refusal are well established in Utah and other jurisdictions. The right of first refusal gives the grantee the right to meet an offer made by a third party, before the seller is free to sell to the third party.[31]

---

[25] *Id.* (*Ferris v. Jennings*, 595 P.2d 857, 860 (Utah 1979)).

[26] Opposition at 9.

[27] *Id.* (citing *Grassy Meadows Sky Ranch Landowners Ass'n v. Grassy Meadows Airport, Inc.*, 283 P.3d 511, 516 (Utah Ct. App. 2012)).

[28] *Id.*

[29] *Id.* at 5.

[30] *See e.g., Kelly,* 256 P.3d at 1258.

[31] *See e.g.*, *Weber Meadow-View Corp. v. Wilde*, 575 P.2d 1053, 1055 (Utah 1978); *Hofmann v. Sullivan*, 599 P.2d 505, 507 (Utah 1979). *See also* 25 Williston on Contracts § 67:85 (4th ed.).

6

Unlike a right of first refusal, it appears that the characteristics of a right of first offer have not been discussed by Utah courts. The parties do not dispute that a right of first offer requires the grantor to give the grantee the right to purchase before the seller may offer for sale to third parties. "Because rights of first refusal can adversely affect an owner's ability to market its property . . . . , a preemptive purchase right often takes the form of a 'right of first offer.' Here, the seller, upon deciding to market its property, must first make an offer to the grantee of the right of first offer. If the grantee does not accept that offer, the seller is then free to sell to anyone else on the terms rejected by the grantee or on terms which are better—but not worse—for the seller; in other words, no other buyer can get a better deal than that which was presented to the grantee."[32] While the *right of first refusal* requires a party to give the right of first refusal holder an opportunity to enter into a transaction on the same terms and conditions *after* negotiating with third parties, a *right of first offer* obligates a seller, *before* negotiating with third parties, to offer to sell to the holder of the right of first offer on specific terms.[33]

When the right of first offer is given to the holder of the right, it is not clear whether it is the seller's obligation to first provide the price and other terms for the sale or if the seller is only obligated to give notice of its intention to sell and provide a period of time during which grantee may make an offer to purchase.[34] Either way, however, it is generally accepted that the price and other material terms (whether offered by seller or holder of the right) become the seller's floor in negotiating with third parties. That is, "no other buyer can get a better deal than that which was presented to the grantee."[35]

---

[32] *Bill Signs Trucking,* 69 Cal. Rptr. 3d at 595 (quoting Greenwald & Asimow, Cal. Practice Guide: Real Property at ¶ 8:200, 8-49 (The Rutter Group 2007)).

[33] *Kelly,* 256 P.3d at 1257–58.

[34] *Compare Kelly,* 256 P.3d at 1258 (stating that landowner makes the offer, including price and other terms and conditions, to the grantee, and the grantee can either accept to reject the offer) and *Bill Signs Trucking,* 69 Cal. Rptr. 3d at 595 (same) *with Rethinking Rights of First Refusal*, 5 Stan. J.L. Bus. & Fin. 1, 39 (1999) ("If the lessor decides to sell the property . . . the lessee will be given notice and a specified period during which to make an offer to purchase. The owner may accept the offer or may, within a specified period, sell to a third party."); Robert K. Wise et. al., *First-Refusal Rights Under Texas Law*, 62 Baylor L. Rev. 433, 519 (2010) (same).

[35] *See id.*

The threshold question is whether Paragraph 2 provides MC Oil a right of first offer, obligating Defendants to first offer additional volumes of oil to MC Oil before they can sell the additional volumes to anyone else, or whether it is merely an expression of the possibility to negotiate potential volume increases sometime in the future. The former interpretation is enforceable, but the latter renders the relevant portions of the paragraph void and unenforceable.

Although MC Oil is correct that a preemptive right is not automatically invalid because it is not sufficiently definite and omits terms, Paragraph 2 does not contain terms that comprise a right of first offer. Simply using the term "first Right of Offer," without more, does not conclusively mean that the contract contains preemptive purchase right provisions. The reference to the right of first offer in Paragraph 2 is encapsulated in language indicating future agreement is required for an obligation to arise.

"A binding contract can exist only where there has been mutual assent by the parties manifesting their intention to be bound by its terms. Furthermore, a contract can be enforced by the courts only if the obligations of the parties are set forth with sufficient definiteness that it can be performed."[36] "[W]here a contract is so uncertain and indefinite that the intention of the parties in material particulars cannot be ascertained, the contract is void and unenforceable."[37]

MC Oil reads the fourth sentence in Paragraph 2— "Likewise Axia agrees to allow MC the first Right of Offer on Additional volumes that Axia produces"—as a stand-alone sentence. The word "likewise" indicates that this sentence cannot be read independent of the preceding sentence which states: "Allowing Axia the first Right of Refusal on additional volumes that MC procures . . . ." And this

---

[36] *Bunnell v. Bills*, 368 P.2d 597, 600 (Utah 1962).

[37] *Stangl v. Todd,* 554 P.2d 1316, 1319 (Utah 1976); *see also Utah Golf Ass'n v. City of N. Salt Lake*, 79 P.3d 919, 921 (Utah 2003) ("An unenforceable agreement to agree occurs when parties to a contract fail to agree *on material terms* of the contract 'with sufficient definiteness to be enforced.'" (emphasis added) (quoting *Cottonwood Mall Co. v. Sine*, 767 P.2d 499, 502 (Utah 1988))).

preceding sentence is an incomplete sentence, because it becomes clear only when read in connection with the sentence before it.

> Axia and MC agree to meet from time to time and discuss potential volume increases under this Agreement. Allowing Axia the first Right of Refusal on additional volumes that MC procures at the local Salt Lake City refineries. Likewise Axia agrees to allow MC the first Right of Offer on additional volumes that Axia produces in the Uintah Basin. If such increases are agreed upon, this Agreement shall be amended to reflect the volume change and any new pricing negotiated.[38]

When read as a whole, Paragraph 2 obligates the parties to "agree to meet from time to time and discuss potential volume increases under this Agreement." Those increases might be of refinery capacity obtained by MC Oil, or of oil produced by Axia. But all such increases are subject to agreement: "If such increases are agreed upon, this Agreement will be amended to reflect the volume change and any new pricing negotiated."[39] The first and last sentences of Paragraph 2 call for future agreement for any binding obligation to arise and encapsulate the central sentences of that paragraph.

Paragraph 2 is also missing other terms that would indicate the existence of a right of first offer. Unlike the right of first offer in *Bill Signs Trucking,* Paragraph 2 does not require Axia to give "notice in writing of its intent to sell, specifying the price and terms of the contemplated sale."[40] Unlike the right of first offer in *Kelly,* there is no requirement of written notice, a deadline for response, a timeframe for proposal and acceptance of an amendment, a prohibition against offering better terms for a specific time period, and a term after which the offer process might be repeated.[41]

The agreement to "agree to meet from time to time" and that "increases [be] agreed upon" is too vague and indefinite to support an enforceable right. The parties clearly agreed to negotiate the potential of volume increases in the future and to amend the agreement to reflect newly negotiated terms.

---

[38] Purchase Agreement ¶ 2.

[39] *Id.*

[40] 69 Cal. Rptr. 3d at 592.

[41] 256 P.3d at 1257.

Although MC Oil contends that there is a sufficiently definite method by which the purchase price can be determined, the fundamental need for an obligation to be definite prevents any attempt to supply terms of the obligation. The parties agreed to nothing more than to negotiate sometime in the future.[42] Based upon the uncontested material facts, viewed in the light most favorable to MC Oil, the broad, indefinite sentences in Paragraph 2 only create an agreement to negotiate in the future, which is unenforceable as a matter of law.

## CONCLUSION

For the reasons set forth above, Defendants' Motion[43] for Partial Summary Judgment is hereby GRANTED.

Dated November 12, 2015.

BY THE COURT:

_____
David Nuffer
United States District Judge

---

[42] *Stangl,* 554 P.2d at 1319.

[43] Docket no. 205.